UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Sheldon Peters Wolfchild et al.,

     Plaintiffs,

v.

                    **MEMORANDUM OF LAW & ORDER**

Redwood County, et al.,          Civil No. 14-1597 (MJD/FLN)

     Defendants.

_____

Erick G. Kaardal and James V.F. Dickey, Mohrman, Kaardal & Erickson, P.A., Counsel for Plaintiffs.

Joseph F. Halloran, Mary B. Magnuson, and Sara K. Van Normand, Jacobson, Magnuson, Anderson & Halloran, P.C., and Michael L. Murphy, Jacobson Law Group, Counsel for Defendant Lower Sioux Indian Community in Minnesota.

Bradley N. Beisel and David J. Krco, Beisel & Dunlevy, P.A. and Leif E. Rasmussen, Steffens & Rasmussen, Counsel for Defendants Dennis A. Auslam and Michelle D. Auslam, Lyle Black Living Trust, Scott A. Olafson and Kimberly A. Olafson, John H. Reynolds and Jeanne A. Reynolds, Allen J Kokesch and Jacalyn S. Kokesch, Prouty Properties, LLC, Thomas J. Heiling, Paul W. Schroeder and Karen J. Schroeder, John Hogan, Bruce Robert Black, Lila L. Black, Douglas Scherer and Brenda Scherer, Charles Case, Enid Guggisberg, et al., Marlene A. Platt Revocable Living Trust, William Schmidt and Norma Schmidt, Simmons Valley Trust, Willard Scherer and Eugenie Scherer, Henry G. O' Neil and Judith A. O' Neil, Lee H. Guggisberg Trust, Harold Guggisberg, Julie Anna Guggisberg, George F. Schottenbauer, Sandra Clarken, et al., Keefe Family Farm LLC, John C. Simmons and Mary J. Simmons, Neil and Donna Berger Family [Trust], TJ & CC Properties LLC, Sherman Acres, LLC, and Charles D. Neitzel; Robert G. Benner, Dunlap & Seeger, P.A., Co-Counsel for Defendant Kenneth

Larsen.

Garth J. Unke and Louise A. Behrendt, Stich, Angell, Kreidler, Dodge & Unke and Richard A. Duncan, Christiana M. Martenson and Michelle E. Weinberg, Faegre Baker Daniels LLP, Counsel for Defendants Elmer C. Dahms and Barbara L. Dahms, Melvin W. Maddock and Kerry D. Maddock, Timothy Kerkoff and Theresa J. Kerkoff, Brent Prouty (Prouty Properties, LLC) Charles Case, Kim M. Cunningham and Mitchell H. Unruh.

Michelle Christensen and C. Todd Koebele, Murnane Brandt, Counsel for Defendants Janie K. Crooks, Rockford L. Crooks, Eugene A. Engstrom, Alice Goelz, Francis Goelz, John Goelz, John Goelz III, Nancy S. Hansen, Patrick T. Hansen, Dawn R. Helmer, Steven R. Helmer, Cynthia Johnson, Allen J. Kokesch, Jacalyn S. Kokesch, Kelly M. Lipinski, Amy M. Lund, Chad M. Lund, Jon Lussenhop, Larry Lussenhop, and Michael R. Rasmussen.

Ken D. Schueler, Robert G. Benner and Jennifer M. Peterson, Dunlap & Seeger, P.A., Counsel for Defendants Julie Anna Guggisberg, Dale R. Hanna, Nancy Hanna, Robert D. and Lori A. Rebstock, Jon Lussenhop, John C. Simmons, and Mary J. Simmons, Lee H. Guggisberg Trust UWT, Scott A. Olafson and Kimberly A. Olafson.

Jack H. Hieb, Richardson, Wyly, Wise, Sauck & Hieb, LLP, Counsel for Defendant Edward J. Gaasch.

Jessica E. Schwie and Allison A. Lindevig, Jardine Logan and O'Brien, PLLP, Counsel for Defendants Redwood County, Renville County, Sibley County, Paxton Township, Sherman Township, Honner Township, Birch Cooley Township and Moltke Township; Glen Jacobsen, Renville County, Co-Counsel for Defendant Renville County ("Municipal Defendants").

Corey J. Ayling, McGrann Shea Carnival Straughn & Lamb, Chartered, Counsel for Defendant Episcopal Diocese of Minnesota.

This matter is before the Court on Defendants' motions to dismiss.  For the reasons set forth below, this matter will be dismissed with prejudice.

## I.     Introduction

### A.     Background

In the early 1800's, the Minnesota Sioux consisted of four bands that lived along the Mississippi River from the Territory of Dakota to the Big Sioux River. (<u>Id.</u> ¶ 10.)  The Mdewakanton and Wahpakoota bands were referred to as the "lower bands" and the Wahpeton and Sisseton bands were referred to as the "upper bands."  (<u>Id.</u> ¶ 11.)

On September 29, 1837, the Minnesota Sioux entered into a treaty with the United States by which they ceded all their land east of the Mississippi River and the islands in said river in consideration of $300,000.  (<u>Id.</u> ¶ 12, citing Treaty of Sept. 29, 1837, arts. I-II, 7 Stat. 538 ("1837 Treaty").)  Under the 1837 Treaty, the United States was required to pay an annuity to the Minnesota Sioux at a rate of not less than five percent interest, to be paid forever.  (<u>Id.</u> ¶ 13.)

In 1851, the lower bands ceded all of the lands in the Territory of Minnesota and the State of Iowa.  (<u>Id.</u> ¶ 14, citing Treaty of August 5, 1851, 10

Stat. 954, art. 1 (the "1851 Treaty").)  The 1851 Treaty further provided that the United States would provide the lower bands a trust fund of $1,160,000, with interest set at five percent, to be paid annually for fifty years.  (Id. ¶ 15, citing 1851 Treaty, art. IV, ¶ 2.)  The upper bands signed a similar treaty on July 23, 1851, by which they ceded all lands in the Territory of Minnesota and the State of Iowa and all lands owned in common by the four bands by natural boundaries. (Id. ¶ 16, citing Treaty of July 23, 1851, art. II, 10 Stat. 949.)  In exchange, the upper bands were to receive a trust of $1,360,000 and interest at 5% to paid out annually for fifty years.  (Id. ¶ 17.)  Both of these treaties provided for the creation of a reservation to run along the Minnesota River.  (Id. ¶ 18.)  The United States Senate, however, amended the compensation provided under the treaties, instead providing that the Minnesota Sioux would be paid 10 cents per acre of the reservation land, which sum was added to the trust funds created by the treaties.  (Id. ¶ 20.)  The Senate also authorized the President to set aside another reservation outside the limits of the ceded land.  (Id. ¶ 21.)  The President did not set aside another reservation, and the Minnesota Sioux continued to live on their reservation along the Minnesota River, which reservation was confirmed by the Act of July 31, 1854, 10 Stats. 326.  (Id. citing Medawakanton and Wahpakoota

<u>Bands of Sioux Indians v. United States</u>, 57 Ct. Cl. 357 (Ct. Cl. 1922)).

In 1858, the United States entered into another treaty pursuant to which the lower bands agreed to cede part of their reservation lying on the north side of the Minnesota River in exchange for money and goods.  (<u>Id.</u> ¶ 24 citing Treaty of June 19, 1858, arts. I-III, 12 Stat. 1031 ("1858 Treaty").)  The 1858 Treaty created a new reservation on land then occupied by the bands along the Minnesota River in south-central Minnesota.  (<u>Id.</u> ¶ 25.)  In addition, the lower bands agreed to preserve friendly relations with the citizens of the United States and to commit no injuries or depredations on their persons or property.  (<u>Id.</u> ¶ 26, citing to 1858 Treaty, art. VI, 12 Stat. at 1031.)

In August 1862, the four bands engaged in an outbreak during which a large number of white settlers were massacred and a significant amount of property was destroyed.  (<u>Id.</u> ¶¶ 27, 28.)  The outbreak was in response to the failure of the United States to furnish the money and supplies promised to the bands in the above referenced treaties.  (<u>Id.</u> ¶ 27.)  The United States determined that the Sioux had breached the treaties by their actions during the uprising, and as a result, Congress abrogated and annulled all treaties between them, and declared all lands and rights of occupancy within the State of Minnesota and

annuities and claims to the United States forfeited.  (Id. ¶ 29.)  A portion of the

annuities remaining were paid out to those settlers who had suffered damages as

a result of the uprising.  (Id. ¶ 30.)  Congress also passed legislation to move the

Minnesota Sioux out of Minnesota and to redistribute their land.  (Id. ¶ 31.)

During the uprising, however, some of the Minnesota Sioux remained

loyal to the United States by not participating in the uprising or by affirmatively

acting to save the settlers.  (Id. ¶ 32.)  Despite their assistance, these loyal Sioux[1]

were rendered poverty-stricken and homeless.  (Id. ¶ 34.)  Notwithstanding the

broad termination of the Sioux treaties, Congress did take steps to provide for

those loyal Sioux that assisted the white settlers.

> [T]he Secretary of the Interior is hereby authorized to set apart of the public
> lands, not otherwise appropriated, eighty acres in severalty to each
> individual of the before-named bands who exerted himself in rescuing the
> whites from the late massacre [by] said Indians.  The land so set apart . . .
> shall not be aliened or devised, except by the consent of the President of
> the United States, but shall be an inheritance to said Indians and their heirs
> forever.

(Id. ¶¶ 36 and 37, quoting Section 9 of the Act of February 16, 1863, 12 Stat. at 654

("1863 Act").)

It is Plaintiff's position that in 1865, the Secretary of the Interior used his

---

[1]This group is also referred to as the loyal Mdewakanton.

authority under the 1863 Act to set apart a 12 square mile reservation for the loyal Sioux. (Am. Comp. ¶ 39.) In a letter dated March 17, 1865, the Secretary delegated this authority to Reverend. S.D. Hinman, Missionary, to designate 12 square miles to the loyal Sioux. (Id. ¶¶ 40, 41, Ex. 1.) In response, Rev. Hinman identified 12 sections of land and wrote them down on the same letter from the Secretary of Interior. (Id. ¶ 42; Ex. 1.) Later, the Secretary initialed the Reverend's selections, which Plaintiffs assert set apart and conveyed such sections to the loyal Sioux. (Id. ¶ 43.)

On March 23, 1865, the Commissioner of Indian Affairs wrote to Rev. Hinman, confirming the decision of the Secretary and that it was sufficient to authorize the Reverend "to proceed to collect and establish the friendly Sioux upon the lands designated by you in your letter of the 17th instant." (Id. ¶ 44; Ex. 2.) In this letter, the Commissioner further noted that $800 had been authorized for plowing the land and for purchasing tools and seeds for the Indians in question. (Id.)

In another letter dated March 23, 1865, Rev. Hinman wrote to Bishop Whipple informing him that he "succeeded in getting upwards of 10,000 acres of land set apart for Taopi & friendly Sioux located at Redwood & including our

7

dear little church.  The Indians are to have 80 acres each - i.e. heads of families -

in fee simple & unalienable."  (Id. ¶ 45; Ex. 3.)  In an undated letter, Rev. Hinman

informed the Bishop of white resistance to the Mdewakanton:

> The Sec. of the Interior, at our request, withdrew from sale, by Ex. Order,
> 10,000 acres for this purpose & located it at & near the old Lower Sioux
> Agency.  Gen. Pope refuse[d] to let these Indians locate there, but Gen.
> Grant overruled Pope and ordered Sibley to allow the settlement to be
> made as we had attempted.  This was however prevented by the feeling at
> New Ulm and on the border generally consequent upon a recent cold
> blood murder by the renegade Indians near Mankato.  This 10,000 acres
> was being withheld from sale for some years, but finally restored for sale.

(Id. ¶ 46; Ex. 4.)

In a report to the Secretary of Interior in April 1866, it was reported that

any attempts to provide for the friendly Sioux was found impracticable "on

account of the hostility manifested by the white people of that region towards

everything in the form of an Indian."  (Id. ¶ 47; Ex. 5.)

### B.  Class Allegations

Plaintiffs seek to bring a class action on behalf of all those persons who are

the statutory beneficiaries of the 1863 Act.  Plaintiffs claim to be the lineal

descendants of an "individual of the before-named [Dakota] bands who exerted

himself [or herself] in rescuing the whites from the late [1862] massacre [by] said

Indians." (<u>Id.</u> ¶ 6.)   Plaintiffs assert they are the specifically-named beneficial

heirs in the statutory phrase "shall be an inheritance to said Indians and their

heirs forever" found in the 1863 Act, which established Plaintiffs as having

exclusive title, occupancy and use and the right of quiet enjoyment to a 12 square

mile reservation that was set aside thereunder. (<u>Id.</u>)  Plaintiffs allege the

proposed class is believed to exceed 20,000 members. (<u>Id.</u> ¶ 73.)

The named Defendants include the Redwood County, Paxton Township,

Sherman Township, Honner Township, Renville County, Birch Cooley

Township, Sibley County and Moltke Township.  Plaintiffs allege each of these

county or townships contain, govern, tax, assess and possess, in part, the 12

square mile reservation at issue herein (<u>Id.</u> ¶ 7.)  The remaining Defendants,

including many individuals, the Episcopal Church and the Lower Sioux

Community, currently possess lands within this reservation. (<u>Id.</u> ¶ 8.)

In Count I, Plaintiffs seek a declaratory judgment that they own exclusive

title, use and occupancy and the right to quiet enjoyment of the following 12

sections in Redwood, Renville and Sibley Counties: Sections 1, 2, 3, 11 and 12,

T.112N, R. 35; Section 35, T. 113 N., R. 35; Sections 5, 6, 7, 8 and 9, T. 112 N., R. 34;

Section 31, T. 113 N., R. 31.  Plaintiffs allege that the 1863 Act has never been

repealed; that the Secretary of Interior, on March 17, 1865, did set apart and

thereby convey the identified lands to the loyal Sioux; and that the United States

sold the 12 square mile reservation to third parties.  (Am. Comp. ¶¶ 83, 84, and

86.)  Plaintiffs further allege that no later act of Congress negated the title of the

land to the loyal Sioux, including the Act of January 3, 1980, P.L. 96-557 and the

1934 Indian Reorganization Act.

Plaintiffs further allege the government did not have the authority to issue

land patents on the land at issue, and that as a result, the land has been wrongly

possessed by the original purchasers and subsequent owners since 1865.  (Id. ¶¶

87-88.)  Plaintiffs allege that after the government issued the erroneous land

patents, the government did purchase some of these lands for transfer to the loyal

Sioux.  (Id. ¶ 89.)

In Count II, Plaintiffs assert a common law claim of ejectment against the

Defendants, as the Defendants wrongfully possess and are trespassing on the

land at issue.  In Count III, Plaintiffs assert a common law claim of trespass.

Plaintiffs seek to have the Defendants and their possessions removed from

the land at issue, and seek damages for trespass in an amount exceeding $75,000.

### C.    Prior Litigation

10

In 2003, certain plaintiffs claiming to represent the lineal descendants of the loyal Mdewakantons filed an action in the Court of Federal Claims pursuant to the Indian Tucker Act, 28 U.S.C. § 1505, against the United States for breach of fiduciary duty based on the government's mismanagement of property originally provided for the benefit of loyal Mdewakantons.  The plaintiffs alleged that the Appropriations Acts of 1888, 1889 and 1890 ("Appropriations Acts") created a trust on behalf of the loyal Mdewakanton to those lands purchased with funds from the Appropriations Acts, and that the plaintiffs had rights to the proceeds of the trust corpus as owners of equitable title to those lands[2].  Wolfchild v. United States, 559 F.3d 1228, 1236 (Fed. Cir. 2009) (Wolfchild VI).  The plaintiffs alleged that they were entitled to a "prorated share of the income, profits and proceeds from all reservation lands at Shakopee, Prairie Island, and Lower Sioux (including but not limited to per-capita payments from casino profits and other revenues)."  Id.

The Federal Circuit Court of Appeals rejected the plaintiffs' claims, finding

---

[2]The lands at issue in the prior litigation involved those lands purchased for the qualifying Mdewakantons pursuant to the Appropriations Acts of 1888, 1889 and 1890 and on which casinos are now operated.  In this case, however, the lands at issue involve a 12 square mile parcel in Redwood, Renville and Sibley counties, which Plaintiffs are seeking possession and damages for trespass, as opposed to revenues from the casinos.

11

that the Appropriations Acts did not create a trust for the benefit of the loyal

Mdewakanton and their lineal descendants, and if such a trust had been created,

Congress terminated that trust with the enactment of legislation passed in 1980.

Id. at 1255, 1260.  Following the Federal Circuit's decision in Wolfchild VI, the

matter was remanded to the trial court for further proceedings.

On remand, the plaintiffs moved to amend their complaint to add a

number of new claims.  The district court denied the motion to amend with one

exception; the court granted plaintiffs' request to add one claim concerning the

1888-90 Acts, "and ruled favorably on that claim in part: it found the government

liable on a claim to pre-1980 revenues from the lands acquired under the

Appropriations Acts, but rejected any claim to funds generated from the lands

after the passage of the 1980 Act."  Wolfchild et al. v. United States, 731 F.3d 1280,

1294-95 (Fed. Cir. 2013) cert. denied, 134 S. Ct. 1516 (Mar. 10, 2014) (Wolfchild IX)

(citing Wolfchild v. United States, 96 Fed. Cl. 302 (2010) (Wolfchild VII)).

Both parties appealed the district court's rulings following remand.  With

respect to the claim that the Appropriations Acts imposed a money-mandating

duty to plaintiffs, the Federal Circuit found no such duty was created by the

Appropriations Acts, and that the claim was essentially substantively similar to

the previously rejected claim that the Appropriations Acts created a trust.

Wolfchild IX, 731 F.3d at 1290.

With respect to plaintiffs' argument that under the 1863 Act, the Secretary of Interior had a duty to set aside 80 acres of land to each loyal Sioux and that the Secretary breached said duty by not setting aside such land, the court held that the 1863 Act provided only that the Secretary was "authorized" to set apart parcels of land, and that such language is "simply too discretionary to support a viable claim for damages."  Id. at 1292.  The court further held the 1863 Act did "not impose any duty on the Secretary to make the land grants that it authorizes. It therefore cannot 'fairly be interpreted as mandating compensation for damages sustained from a failure to provide such lands.'"  Id. (quoting United States v. Navajo Nation, 556 U.S. 287, 291 (2009)).

The court also rejected the plaintiffs' alternative claim that lands were set aside in 1865 under the authority of the 1863 Act.  Specifically, plaintiffs contended that the Secretary identified 12 sections of land for the loyal Sioux and withdrew them from public sale, which sufficiently set them apart.  Id.  The court held, however, that the 1865 actions do not support a timely claim for relief.  Id. The court went on to find that the government "took the steps toward

conveyance of the 12 sections" but terminated the process of conveying the 12

sections to the designated Indians and sold the parcels to others.  Id. at 1293.

Following the dismissal of their claims by the Federal Circuit, Plaintiffs

filed the action currently before the Court.

## II.     Motions to Dismiss

Before the Court are multiple motions to dismiss.  Motions were filed on

behalf of individual landowner Defendants, the municipal Defendants, the

Episcopal Diocese and the Lower Sioux Indian Community.

### A.     Sovereign Immunity

"As a matter of federal law, an Indian tribe is subject to suit only where

Congress has authorized the suit or the tribe has waived its immunity." Contour

Spa at the Hard Rock, Inc. v. Seminole Tribe of Florida, 692 F.3d 1200, 1203-04

(11th Cir. 2012) (quoting Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751,

754 (1998)).  Absent a waiver or congressional authorization, the Court does not

have subject matter jurisdiction over an action against a federally recognized

tribe.  Michigan v. Bay Mills Indian Community, 134 S. Ct. 2024, 2031 (2014)

(finding that dismissal of action against Defendant Indian Community was

warranted where Congress did not authorize suit); Maxam v. Lower Sioux Indian

14

Community of Minnesota, 829 F. Supp. 277, 281 (D. Minn. 1993) (finding that by

conducting Class II gaming pursuant to the Indian Gaming Regulatory Act, the

Lower Sioux Community had waived sovereign immunity and was subject to

suit with regard to activities related to gaming).

The Defendant Lower Sioux Indian Community (the "Community") is a

federally recognized Indian tribe pursuant to the Indian Reorganization Act

("IRA") of 1934 and 1994, 25 U.S.C. §§ 479, 479a-1; 72 Fed. Reg. 13648, 13649

(listing separately as tribes the "Lower Sioux Indian Community in the State of

Minnesota," the "Prairie Island Indian Community in the State of Minnesota"

and the "Shakopee Mdewakanton Sioux Community in the State of Minnesota");

see also Maxam, 829 F. Supp. at 279 (finding that the Lower Sioux Indian

Community is a federally recognized tribe).  The Community asserts that it has

not waived sovereign immunity with respect to lands in which the Community

has an interest.

Plaintiffs respond that the Community is not itself an Indian tribe, but is

part of the Mdewakanton Band which is the historically recognized tribe under

the IRA.  In support, Plaintiffs cite to an April 15, 1938 Solicitor Opinion which

provided that the Community was an Indian group that was organized on the

basis of their residence upon reserved land, and as such, it may not have those

powers as rest upon the sovereign capacity of the tribe. (Kaardal Decl. Ex. B.)

The Court finds that the Community is a federally recognized tribe that has

equal sovereign rights, as the Solicitor Opinion from the Department of Interior

issued in 1938 no longer reflects a correct interpretation of current law.  See 25

U.S.C. § 476 (f) ("Departments or agencies of the United States shall not

promulgate any regulation or make any decision or determination pursuant to

the Act of June 18, 1934 (25 U.S.C. 461 et seq., 48 Stat. 984) as amended, or any

other Act of Congress, with respect to a federally recognized Indian tribe that

classifies, enhances, or diminishes the privileges and immunities available to the

Indian tribe relative to other federally recognized tribes by virtue of their status

as Indian tribes."), and (g) ("Any regulation or administrative decision or

determination of a department or agency of the United States that is in existence

or effect on May 31, 1994, and that classifies, enhances, or diminishes the

privileges and immunities available to a federally recognized Indian tribe relative

to the privileges and immunities available to other federally recognized tribes by

virtue of their status as Indian tribes shall have no force or effect."); see also H.R.

Rep. No. 103-781, 3-4 (1994) (providing that all recognized tribes have equal

sovereign rights).

Because there is no evidence or even an allegation that the Community has

waived sovereign immunity with respect to lands in which it has an interest, the

Court does not have subject matter jurisdiction over the Community in this

action, and all claims asserted against the Community must be dismissed.

### B.    No Private Right of Action

The Court finds that the remainder of the claims must also be dismissed as

Plaintiffs have failed to assert a claim upon which relief may be granted.  As

discussed previously, Plaintiffs' claims flow from the 1863 Act.  Plaintiffs

characterize their claims as being based on federal common law, citing to Oneida

Cnty., N.Y. v. Oneida Indian Nation of New York State, 470 U.S. 226, 233 (1985).

(Am. Comp. ¶ 4.)  But it is clear from the remaining allegations in the Amended

Complaint that their claims arise under the 1863 Act. (See Am. Comp. ¶¶ 36-38;

83-91.)  They repeatedly allege that their rights to the land at issue arose pursuant

to Section 9 of the 1863 Act, and that in 1865, the Secretary of the Interior took the

necessary steps to convey the land to Plaintiffs pursuant to the 1863 Act.  The

1863 Act, however, does not provide for a private right of action, and "the fact

that a federal statute has been violated and some person harmed does not

automatically give rise to a private cause of action in favor of that person."

Touche Ross & Co. v. Redington, 442 U.S. 560, 568 (1979).

Statutory intent is determinative of whether a statute creates a private right of action.  Alexander v. Sandoval, 532 U.S. 275, 286 (2001).  Where a statute does not contain an express right of action, courts must examine Congressional intent to determine whether such a right is implied in either "the language or structure of the statute, or in the circumstances of its enactment."  Thompson v. Thompson, 484 U.S. 174, 179 (1988).  An inference of intent is typically not found where Congress framed a statute as a general prohibition or a command to a federal agency, rather than drafting legislation with a specific focus on the benefitted class.  Cannon v. Univ. of Chicago, 441 U.S. 677, 690-92 (1979).

These principles apply to preclude claims by Indian tribes and individuals seeking to enforce federal statutes, where the statute does not specifically provide an enforcement mechanism or is phrased as a directive to the government.  See e.g., Dewakuku v. Martinez, 271 F.3d 1031, 1040 (Fed. Cir. 2001) (finding no private right of action under the Indian Housing Act); Nisqually Indian Tribe v. Gregorie, 623 F.3d 923, 930 (9th Cir. 2010) (same).

While it is clear that Section 9 of the 1863 Act was intended to benefit the

18

loyal Mdewakantons, there is no language in the 1863 Act or in the legislative

history to demonstrate an express or implied intent by Congress to provide a

private judicial remedy in favor of the loyal Mdewakantons.  The language of the

1863 Act authorizes the Secretary to set apart land for the loyal Mdewakantons,

but it does not mandate that such land be set apart.  See Wolfchild, 731 F.3d at

1292.  The legislative history of the 1863 Act reiterates the discretionary nature of

the power granted to the Secretary, given the tensions between the Indians and

the white settlers at that time.  See generally Cong. Globe, 37th Cong. 3d Sess. 33

(1863) (Attached as Ex. O to the Schwie Declaration.)  In fact, Senator Henry Rice

noted his concern that opposition could be expected should Indians be provided

with substantial property rights.  Id. at PUBREC000068.

Because the 1863 Act does not provide for a private right of action,

Plaintiffs cannot rely on that Act in seeking a declaration of possessory rights.

See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-672 (1960) (noting

that the Declaratory Judgment Act is procedural only).  In addition, because the

1863 Act does not provide for a private right of action, the Declaratory Judgment

Act does not operate to transform such a non-existent right into a claim that may

be remedied.

Plaintiffs' reliance on the <u>Oneida</u> decision is also misplaced.  In that case, the Court recognized a federal common law right to sue for enforcement of Indian property rights based on aboriginal title.  <u>Oneida</u>, 470 U.S. at 232-32 (recognizing that "Indian nations held aboriginal title to lands they had inhabited from time immemorial" subject to the doctrine of discovery, which provides that "discovering nations held fee title to these lands, subject to the Indians' right of occupancy and use.").  Here, Plaintiffs are not suing to enforce aboriginal land rights in the property at issue.  Lacking such rights, <u>Oneida</u> does not support Plaintiffs' assertion that they are asserting a federal common law claim, rather than a claim under the 1863 Act.

## C.    <u>Sherrill</u> Doctrine

Even if Plaintiffs did state a claim for relief, the Court would nonetheless dismiss the remaining claims based on the Plaintiffs' unreasonable delay in bringing this action.

As discussed previously, Plaintiffs' claim they have exclusive title, occupancy and use and the right of quiet enjoyment to the 12 square mile reservation that was set aside in 1865, pursuant to the 1863 Act.  Plaintiffs further claim that the Defendants who currently are in possession of these lands do not

have title to those lands, as the United States, without the authority to do so, sold the land at issue between 1865 and 1895.  (Am. Comp. ¶¶ 85-87.)  Because of erroneous federal land patents issued by the United States, the land has been wrongfully possessed since 1865.  (Id. ¶ 88.)  In addition to declaratory relief, Plaintiffs request that Defendants and their possessions be removed from such lands and that Plaintiffs are entitled to damages for trespass on their land.

The Defendants include municipalities that have property interests in the land at issue, including road rights of way and easements, and are the beneficiaries of tax and assessment revenues.  The Defendants also include individual property owners who have purchased, inherited or were granted lands within the 12 square mile reservation at issue, and who use and occupy the lands and who have improved and developed the land for agriculture, business, or for private residences.

Because Plaintiffs are asking the Court to dispossess the Defendants of land that they and their predecessors have owned and used for the past 150 years,  the Defendants move to dismiss the Amended Complaint as equitably barred under the Sherrill doctrine.  City of Sherrill v. Oneida Indian Nation, 544 U.S. 197, 202 (2005).

At issue in <u>Sherrill</u> was whether the Oneida Indian Nation ("OIN") could resist the payment of real estate taxes on land purchased in 1997 and 1998 through the open market, that was once contained within the OIN's 300,000 acre reservation established in 1788.  544 U.S. at 203.  The parcels at issue were last possessed by the OIN in 1805.  <u>Id.</u> at 202.  The district court found that the land owned by the OIN was not taxable, and a divided panel of the Second Circuit Court of Appeals affirmed.  <u>Id.</u> at 212.

The Supreme Court reversed the judgment of the Court of Appeals, finding that "'standards of federal Indian law and federal equity practice' preclude the Tribe from rekindling embers of sovereignty that long ago grew cold."  <u>Id.</u> at 214.  The Court acknowledged that in a previous decision, it had recognized the OIN's ability to maintain a claim for compensation for a violation of their possessory rights based on federal common law.  <u>Id.</u> at 209.  The Court noted, however, that "[t]he question whether equitable considerations should limit the relief available to the present day Oneida Indians was not addressed by the Court of Appeals or this Court."  <u>Id.</u>

> The wrongs of which OIN complains in this action occurred during the early years of the Republic.  For the past two centuries, New York and its county and municipal units have continuously governed the territory.  The Oneidas did not seek to regain possession of their aboriginal lands by court

decree until the 1970's.  This long lapse of time, during which the Oneidas did not seek to revive their sovereign control through equitable relief in court, and the attendant dramatic changes in the character of the properties, preclude OIN from gaining the disruptive remedy it now seeks.

Id. at 216-17.

The Court then found that "[t]he principle that the passage of time can preclude relief has deep roots in our law" and has been recognized in the guises of laches, acquiescence and impracticability.  Id. at 218.  Considerations as to whether to apply the doctrine of laches or acquiescence include changes to the value and character of the land, and whether "longstanding observances and settled expectations" would warrant that a claim be barred.  Id. at 217-18.  The Court also noted that it had previously "recognized the impracticability of returning to Indian control land that generations earlier passed into numerous private hands."  Id. (citing Yankton Sioux Tribe v. United States, 272 U.S. 351, 357 (1926)).  Applying these principles to the claims at issue, the Court held:

[T]he distance from 1805 to the present day, the Oneidas' long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations, evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate.

Id. at 221.

The <u>Sherrill</u> doctrine has been applied to dismiss centuries old Indian land claims that would have a disruptive effect and would upset the justified expectations of the Defendants in a number of cases. <u>See, e.g.,</u> <u>Stockbridge-Munsee Cmty. v. New York</u>, 756 F.3d 163, 164 (2d Cir. 2014) (affirming district court's grant of motion to dismiss Indian tribe's claims seeking trespass damages and eviction, finding that "[I]t is well-settled that claims by an Indian Tribe alleging that it was unlawfully dispossessed of land early in America's history are barred by the equitable principles of laches, acquiescence, and impossibility."); <u>Oneida Indian National of New York v. County of Oneida</u>, 617 F.3d 114 (2d Cir. 2010) (same); <u>Cayuga Indian Nation of New York v. Pataki</u>, 413 F.3d 266 (2d Cir. 2005) (same); <u>Canadian St. Regis Bank of Mohawk Indians v. New York,</u>, 2013 WL 3992830 (N.D.N.Y. Jul. 23, 2013) (dismissing claims based on <u>Sherrill</u> laches doctrine); <u>Onandaga Nation v. State of New York</u>, Civ. No. 5:05-314, 2010 WL 3806492, at *8 (N.D.N.Y. Sept. 22, 2010) (same).

The landowner Defendants assert that public records establish that their title to the properties at issue originated with land patents and grants issued in the 1800's.  (Schwie Decl. Exs. J, W.)  Since that time, the Defendants and their predecessors in title have used and occupied the properties, improving and

developing the land for agriculture, businesses and residences.  Throughout this time, the land has also been governed and taxed by the State of Minnesota and the Municipal Defendants.  The public record further demonstrates that ditches, watershed districts, roads and other rights of way were openly established and used.  Plaintiffs do not dispute that by 1891, all land patents for the disputed area had been issued.  Plaintiffs thus had notice, for well over one hundred years, that others were in wrongful possession of land to which Plaintiffs now claim title.

The Defendants further argue that the claims at issue in this case are even more unfounded and disruptive than the claims at issue in Sherrill.  In Sherrill, the Oneidas were only asking that their property be removed from the local tax rolls.  In this case, Plaintiffs seek to divest the Defendants from more than one hundred years of ownership rights and overturn one hundred years of developments and improvements to the land.  In addition, in Sherrill, the Oneidas were and are a federally recognized tribe and indisputably once held aboriginal title to the land at issue.  Here, Plaintiffs are not an Indian tribe.  Rather, they are a group of individuals claiming Indian descent, that includes persons who were never enrolled members of either the Prairie Island Indian Community, the Lower Sioux Indian Community or the Shakopee Mdewakanton

Sioux Community.

Plaintiffs argue that the defense of laches depends on disputed facts, therefore it is inappropriate to make this determination on a motion to dismiss. Plaintiffs further argue that Sherrill and Stockbridge are inapplicable, as those cases involved claims based on aboriginal title and wrongful sale of lands under federal law whereas in this case, the claims are based on the establishment of title in a group of Indians by Act of Congress.  Finally, Plaintiffs argue that their trespass damages claim cannot be barred by laches, as it is a legal claim, not an equitable claim.  See e.g., Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962, 1973-74 (2014).

The Court finds no basis upon which to distinguish this case from those asserted in Sherrill or Stockbridge.  It is clear that Plaintiffs' claims flow from the 1863 Act.  It is also clear that the land at issue here was sold to third parties no later than 1895.  See Wolfchild IX, 731 F.3d at 1293.  Plaintiffs' claims are thus like those described in Stockbridge: "Indian land claims asserted generations after an alleged dispossession that are inherently disruptive of state and local governance and the settled expectations of current landowners and are subject to dismissal on the basis of laches, acquiescence, and impossibility."  Id. 756 F.3d at 165.

There is no language in <u>Sherrill</u> or <u>Stockbridge</u> that would limit the holdings of

those decisions to claims based on aboriginal title.

Based on the particular characteristics and history of the claims at issue

here, the Court finds that Plaintiffs' claims are equitably barred.  Application of

the equitable bar set forth in <u>Sherrill</u> does not require a balancing of equities

between the parties.  Instead, the equitable bar focuses on Plaintiffs' delay in

seeking relief, and the disruption that would result to settled and justified

expectations regarding land ownership.  <u>Sherrill</u>, 544 U.S. at 216-17, 221 (finding

that "the Oneidas' long delay in seeking equitable relief against New York or its

local units, and developments in the city of Sherrill spanning several generations,

evoke the doctrines of laches, acquiescence, and impossibility, and render

inequitable the piecemeal shift in governance this suit seeks unilaterally to

initiate").

With respect to Plaintiffs' argument that its trespass claim is a legal claim

not subject to an equitable bar, such an argument has already been rejected.  <u>See</u>

<u>Cayuga Indian Nation</u>, 413 F.3d at 278 (finding "[b]ecause the trespass claim, like

plaintiffs' other requests for relief, depends on the possessory land claim, a claim

we have found subject to laches, we dismiss plaintiffs' trespass claim, and

plaintiffs' other remaining claims, along with the plaintiffs' action in ejectment.")

Based on the sound reasoning set forth in <u>Cayuga Indian Nation</u>, this Court finds

that Plaintiffs' trespass claims depend on their possessory land claims, which are

subject to laches, as set forth above.

**IT IS HEREBY ORDERED** that Defendants' Motions to Dismiss [Doc. Nos.

125, 126, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 155, 162, 166

and 182] are **GRANTED**.  This action is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Date:  March 5, 2015


s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court